[No. H014264. Sixth Dist. July 26, 1996.]

MONTGOMERY WARD & CO., INC., Plaintiff and Appellant, v. COUNTY OF SANTA CLARA, Defendant and Respondent.

## COUNSEL

Stephens, Berg & Lasater, Mark G. Ancel and C. Stephen Davis for Plaintiff and Appellant.

Steven M. Woodside, County Counsel, and James J. Rees, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**COTTLE, P. J.**—In this appeal, we are asked to determine whether a county may levy escape assessments more than four years after July 1 of the year in which a change of ownership occurs. We hold that it may. Accordingly, we affirm the trial court's ruling denying the plaintiff's request for a refund of escape assessments paid.

### FACTS

The pertinent facts are undisputed. Under Proposition 13 (Cal. Const., art. XIII A), county assessors must reassess real property upon a change of

ownership, except in certain limited circumstances not applicable here. In June 1988, plaintiff acquired leasehold interests in five parcels of commercial real property in Santa Clara County. The acquisitions resulted in a change of ownership of those properties within the meaning of Proposition 13. Plaintiff promptly notified the State Board of Equalization (SBE) and the Santa Clara County Assessor's Office (County).

Although it received notice of the change in ownership in 1988, County did not reassess the five subject properties until late 1992 and early 1993. Shortly thereafter, in April 1993, it billed plaintiff for additional taxes on the five properties for the 1989-1990, 1990-1991, 1991-1992 and 1992-1993 tax years. It did not seek additional taxes for the 1988-1989 tax year.

Plaintiff paid the taxes under protest and then filed this action for a refund. After a trial, which was submitted on a stipulated statement of facts,[1]

---

[1]The stipulated facts are as follows: "1. The Plaintiff corporation is an Illinois corporation which is qualified to do business, and is doing business, in the state of California. [¶] 2. The Defendant, County of Santa Clara, is a body corporate and politic existing and doing business by virtue of the laws of the state of California. [¶] 3. The assessor's parcels are designated as follows and located within the cities hereinafter described.

"209-35-005 in Sunnyvale
"592-19-006 store parcel - San Jose
"592-19-20, a 24% interest in a strip parcel all located in San Jose
"307-11-09 store parcel - San Jose
"307-11-08 a tire battery and accessory (tba) - San Jose [¶] 4. For the purposes of the instant action, and the legal issues raised herein, the parties have stipulated that the Plaintiff has exhausted its administrative remedies. Neither the Defendant County of Santa Clara nor the Assessor has waived the position of the County and/or the Assessor that Assessment Appeals No. 92.2400 (involving APN 307-11-009) and No. 92.2401 (involving APN 592-19-006) were not timely filed, relative to the issue of valuation. [¶] 5. All of the above-described assessor's parcels contain both land and improvements which were leased by the plaintiff for a term which under the provisions of California Revenue & Taxation Code § 61(c)(1) exceeded a term of 35 years or more, including renewal options, such that upon a change of control of a corporation as defined within § 64(c) of the Revenue & Taxation Code, a change of ownership within the definition of Revenue & Taxation Code § 60 would occur. On or about the 23rd day of June 1988, such a change of ownership as defined in Revenue & Taxation Code § 60 did occur. [¶] 6. As required by Revenue & Taxation Code § 480.1, statements of change in control of ownership of legal entities were filed with the California State Board of Equalization on or about July 7, 1988, which did, on or about September 8, 1988, advise the assessor of the County of Santa Clara that the above-described property was subject to revaluation pursuant to the provisions of Article XIIIA (Proposition 13) and its implementing legislation. Additionally, the assessor was directly advised by the plaintiff of the change of ownership on or about August 10, 1988. [¶] 7. On September 18, 1992, the Assessor of the County of Santa Clara sent a 'Notification of Changed Assessment' relative to APN 209-35-005 to the Plaintiff which stated that corrected values were enrolled. Said 'Notification' set forth corrected assessed values for the referenced property for the years

the briefs of the parties, and the arguments of counsel, the court ruled in favor of County. Relying on Revenue and Taxation Code sections 532 and

1989/90; 1990/91; 1991/92 and 1992/93. On October 22, 1992, the Assessor sent to the Plaintiff a 'Notification of Supplemental Assessment' relative to APN 209-35-005. Said Notification stated a new base year value for the 1988/89 tax year as a result of the transfer on June 23, 1988. [¶] With respect to APN 592-19-006, on February 19, 1993, the Assessor sent to the Plaintiff's lessor a 'Notification of Corrected Assessment' which stated that incorrect values had been enrolled. Said 'Notification' then set forth corrected assessed values for each of the years 1989/90; 1990/91; 1991/92; and 1992/93. [¶] With respect to APN 592-19-020, on February 19, 1993, the Assessor sent to the Plaintiff's lessor a 'Notification of Corrected Assessment' which stated that incorrect values had been enrolled. Said 'Notification' then set forth corrected assessed values for each of the years 1989/90; 1990/91; 1991/92; and 1992/93. [¶] The 'corrected values' set forth on the 'Notifications of Corrected Assessments' for each of the three aforementioned parcels were determined by the Assessor by appraising each property as of the time of transfer in June of 1988. After that value was determined the Assessor then applied to it the inflation factor of two percent (2%) per year and thereafter the Assessor then applied the same factor for each of the four years 1989/90 through 1992/93. [¶] On April 23, 1993, the Assessor sent to the Plaintiff's lessor a 'Notification of Supplemental Assessment' relative to APN 592-19-006 which stated the new base year value. No Notification of Supplemental Assessment relative to APN 592-19-20 has been sent to the Plaintiff. [¶] 8. With respect to APNs 307-11-008 and 307-11-009, Notices of Supplemental Assessment were sent to the Plaintiff's lessor on January 22, 1993. [¶] 9. In the case of APN 209-35-005, the records show that the Assessor appraised Wards LEOP (Legal Entity Ownership Program), which corrects a previous entry in which a two parcel event was not factored for the 1989 roll. [¶] In respect of assessor's parcels 307-11-008 and 307-11-009, assessments were made for the years 1989, 1990, 1991 and 1992 increasing the values for the foregoing years. There is a notation 'Supplemental Deleted by SB-9581 prior to 2/89 Beyond Statute of Limitations.' Assessment calculations disclose that Wards Store, Wards TBA and a portion of common area parking have all been increased as a result of the change of ownership of Wards. The notations with respect to parcel 307-11-009 on the total property information form show an increase for 1989, 1990, 1991 and 1992 tax years, but bear the notation that 'Sup. Deleted by S.B. 9583 - Prior to 2/89: Beyond Statute of Limitations.' The assessment calculations which show an increase attributable to Wards LEOP 6/88 demonstrate how that calculation was made. The values and area by parcel demonstrate the same information commencing with the 1989 roll as being caused by Wards LEOP on 6/23/88. [¶] For assessor's parcel 592-19-006 the total property information base year record bear the notation 'Wards 6/23/88 LEOP Approximately 31 years remaining on building and ground lease. Supplemental values not worked timely and not enrolled.' The form designated as legal entity ownership program (LEOP) discloses that the transfer is dated 6/23/88, recorded 9/8/88. For parcel 020, the base year record, the notation is made that 'not timely for supplemental roll.' Increases are listed for years 1989, 1990, 1991 and 1992. There are set forth valuations commencing with 1989. The accompanying assessment calculations show a 6/23/88 reappraisal attributable to Wards change of ownership. [¶] 10. At the time set for hearing before the Assessment Appeals Board of the County of Santa Clara in connection with the applications of plaintiff, County Counsel did advise the Board and the Board did find that it did not have jurisdiction to hear the legal issues relating to the limitations on making of assessments. The parties have agreed, however, that any valuation issues should be deferred until the determination of the legal limitation issues. [¶] 11. Plaintiff has paid all tax bills sent to it, or to its landlord, resulting from the assessments which have been made by the

51.5[2] and the case of *Blackwell Homes* v. *County of Santa Clara* (1991) 226 Cal.App.3d 1009 [277 Cal.Rptr. 251], the court held that the additional tax billings ("escape assessments") were not time barred. Plaintiff appeals.

county Assessor and asserts that in respect of each of the locations herein described for each of the years through 1992, the following excessive assessments have been made:

| "YEAR | APN | TOTAL |
|---|---|---|
| "LOCATION #1533 | - CAPITOL SQUARE | |
| "1992 | 592-19-006-V1 | 7,771,600 |
| "1991 | 592-19-006-E1 | 7,619,217 |
| "1990 | 592-19-006-E0 | 7,469,820 |
| "1989 | 592-19-006-E9 | 7,323,352 |
| "1988 | 592-19-006** | 7,179,756 |
| "LOCATION #1533 | - CAPITOL SQUARE | |
| "1992 | 592-19-020-V1 | 1,658,964 |
| "1991 | 592-19-020-E1 | 1,626,435 |
| "1990 | 592-19-020-E0 | 1,594,543 |
| "1989 | 592-19-020-E9 | 1,563,277 |
| "1988 | 592-19-020** | 1,532,625 |
| "LOCATION #2445 | - WESTGATE | |
| "1992 | 307-11-008-V1 | 622,916 |
| "1991 | 307-11-008-E1 | 610,703 |
| "1990 | 307-11-008-E0 | 598,729 |
| "1989 | 307-11-008-E9 | 586,988 |
| "1988 | 307-11-008** | 575,478 |
| "LOCATION #2445 | - WESTGATE | |
| "1992 | 307-11-009-V1 | 5,078,662 |
| "1991 | 307-11-009-E1 | 4,979,081 |
| "1990 | 307-11-009-E0 | 4,881,453 |
| "1989 | 307-11-009-E9 | 4,785,738 |
| "1988 | 307-11-009-M8** | 4,691,900 |
| "LOCATION #2526 | - SUNNYVALE* | |
| "1992 | 209-35-005 | 3,962,296 |
| "1991 | 209-35-005 | 3,884,604 |
| "1990 | 209-35-005 | 3,808,436 |
| "1989 | 109-35-005 | 3,733,761 |
| "1988 | 209-35-005 | 3,660,550 |

"12. Incorporated in this Statement of Facts are the records of the Assessor relative to the subject properties for the years at issue. Said records are attached hereto. [¶] 13. The 'corrected values' set forth on the 'Notification of Corrected Assessments' for each of those subject properties were determined by the Assessor by appraising each such property as of the time of transfer in June of 1988, and then applying the two percent (2%) per year inflation factor for each of the four years from, and including, 1989/90 through 1992/93. [¶] 14. The 'corrected assessments' as set forth on the 'Notifications of Corrected Assessments' for each of the subject properties APN's 209-35-005; 307-11-008; 307-11-009; 592-19-020 and 592-19-006 were then billed as escape assessments by the Santa Clara County Tax Collector. Plaintiff, its lessor or its agent received those tax bills on, or about, April 13, 1993, and Plaintiff made timely payment of those bills."

[2]All further statutory references are to the Revenue and Taxation Code unless otherwise specified.

*Statutory Scheme*

"The county assessor is required annually to discover all taxable property within [the] county, to assess it at its 'full value' on the lien date (generally Mar. 1), to enter that value on the assessment roll, and to deliver the assessment roll to the auditor by July 1. (§§ 110, 110.5, 401.3, 405, 601-617, 2192.) 'Full value' of real property was defined, prior to the adoption of Proposition 13 (Cal. Const., art. XIII A), as 'fair market value' or 'full cash value' or 'the amount of cash or its equivalent which property would bring if exposed for sale in the open market . . . .' (§ 110.)

"If the assessor, after certifying the assessment roll, found that a property had been assessed over or under its current fair market value, [the assessor] could make adjustments in the form of refunds of taxes, if the property was overassessed, or in the form of additional tax billings, called escape assessments, if the property was underassessed. ([Citation]; §§ 469, 531, 533.) These refunds or escape assessments could be issued for as many years as permitted by statute, usually four. (§§ 532, 4831.)

"Proposition 13, which limited ad valorem property taxes to a maximum of 1 percent, changed the standard for determining the 'full value' of real property. It limited full cash value to the lower of fair market value or the property's 'base year value.' (Cal. Const., art. XIII A, § 2, subd. (b); § 51.) Base year value was defined as the county assessor's valuation as shown on the 1975-1976 tax bill or, if the property was newly constructed or changed ownership thereafter, the fair market value as determined under previous law on the date of the purchase, new construction, or change of ownership. (Cal. Const., art. XIII A, § 2, subd. (a); § 110, 110.1.) Increases in the base year value were limited to a maximum of 2 percent per year. (Cal. Const., art. XIII A, § 2, subd. (b); §§ 51, 110.1, subd. (f).)

"The Legislature provided that where 1975 base year values were incorrect, assessors had until June 30, 1980, to correct them (by reassessing the property) and to levy escape assessments. (§ 110.1, subd. (c).) However, until 1988, the Legislature provided no guidelines to assessors for correcting post-1975 base year values which were incorrect due to a change of ownership or new construction. . . ." (*Blackwell Homes* v. *County of Santa Clara*, *supra*, 226 Cal.App.3d at pp. 1013-1014.)

Effective January 1, 1988, the Legislature enacted section 51.5 "permitting assessors to correct on discovery any base year valuation or error not involving the exercise of the assessor's judgment. (§ 51.5, subd. (a).) In those cases, there is no limitations period to revise the base year value;

however, escape assessments may be levied for only four years where there has been no taxpayer fraud. On the other hand, where the underassessment was the result of an 'assessor's judgment as to value,' any correction must be made 'within four years after July 1 of the assessment year for which the base year value was first established.' (§ 51.5, subd. (b).) Expressly excluded from the four-year limitations period are errors and omissions resulting from taxpayer fraud, concealment, misrepresentation or failure to furnish information, or assessor errors which 'resulted in a base year value that was not intended by the assessor at the time it was determined.' (§ 51.5, subd. (f)(2).) The Legislature reiterated that 'assessment year' meant 'assessment year' as defined in section 118, rather than, as [a Court of Appeal had held in *Dreyer's Grand Ice Cream, Inc.* v. *County of Alameda* (1986) 178 Cal.App.3d 1174 (224 Cal.Rptr. 285)], the year when the base value of the property was determined. (§§ 51.5, 531.2, 532.)" (*Blackwell Homes* v. *County of Santa Clara, supra,* 226 Cal.App.3d at p. 1015.)

Prior to 1983, reassessments due to changes in ownership or new construction were not made until the following year. This resulted in a delay of from four months to sixteen months from the date of the triggering event. The Legislature found this was "an unwarranted reduction of taxes for some taxpayers with a proportionate and inequitable shift of the tax burden to other taxpayers." (§ 75.) Accordingly, it enacted in July 1983 a new "supplemental assessment" rule. Under the new legislation, the assessor was required to appraise property effective "the date the change in ownership occurs or the new construction is completed. The value so determined shall be the new base year value of the property or the new construction." (§ 75.10.) A supplemental assessment would then be placed on the supplemental roll representing "the difference between the new base year value and the taxable value on the current roll." (§ 75.11, subds. (a), (b).)[3]

In 1992, the Legislature set a limitations period on the assessor's right to levy supplemental assessments. Effective September 14, 1992, a supplemental assessment was invalid unless placed on the supplemental roll by "[t]he fourth July 1 following the July 1 of the assessment year in which the event

---

[3]The effect of the new supplemental assessment rules can be illustrated by examining the facts in *Blackwell Homes* v. *County of Santa Clara, supra,* 226 Cal.App.3d 1009. There the triggering event (a change in ownership) occurred on July 31, 1982. However, because there were no provisions for levying supplemental assessments at that time, the property was not reassessed until the following year. Thus, the assessor could seek back taxes for the first time in 1983, as that was the first year in which the property escaped taxation. Had the new rule allowing for supplemental assessments been in effect, the property could have been reassessed in 1982, and the assessor could have sought a supplemental assessment for that year (provided the assessor levied the supplemental assessment in a timely manner).

giving rise to the supplemental assessment occurred."[4] (§ 75.11, subd. (d)(1).)

The Legislature specifically noted that the new limitations period for levying supplemental assessments did not in any way affect limitations periods applicable to escape assessments. Statutes of 1992, chapter 663 provides: "SEC. 3. It is the intent of the Legislature that the amendments made by Section 1 of this act to Section 75.11 of the Revenue and Taxation Code shall not be construed to alter in any way the application of the limitations period for escape assessments, established in Section 532 of the Revenue and Taxation Code, and interpreted in the case of Blackwell Homes v. County of Santa Clara, 226 Cal.App.3d 1009."

Finally, in amendments not applicable in the instant case, the Legislature in 1994 and 1995 amended section 532, which contains the statute of limitations for levying escape assessments. The revisions provide that where property has escaped taxation following a change of ownership, the limitations period will not commence "until July 1 of the assessment year in which either a change in ownership statement, as required by Section 480, 480.1, or 480.2, or a preliminary change in ownership report, as required by Section 480.3, is filed with respect to the event giving rise to the escape assessment or underassessment." (§ 532, subd. (b).)

## DISCUSSION

Plaintiff frames the following issues on appeal: (1) whether section 532 bars escape assessments made more than four years after July 1 of the year in which a change of ownership occurs; (2) whether sections 51.5 and 75.11, subdivision (d), allow assessors to determine a new base year value more than four years after July 1 of the year in which a change of ownership occurs; (3) whether, if escape assessments are not barred by sections 51.5, 75.11 and 532, they are barred by Code of Civil Procedure section 338, subdivision (a); (4) whether escape assessments should be barred by equitable principles; and (5) whether valuation of property following a change of ownership involves exercise of the assessor's judgment?

We will address issues one, two and five together. Before we begin, however, we shall recapitulate the pertinent facts: (1) a change in ownership

---

[4]Exceptions were made (1) if the assessment was subject to a penalty assessment, in which case the limitations period was increased to six years, or (2) if the change in ownership or new construction went unrecorded and was not reported, in which case the limitations period was eight years. The statute's wording was slightly altered in 1994 and the eight-year limitations period was eliminated.

occurred in June 1988, (2) plaintiff immediately notified SBE and County, but (3) County did not reassess the properties, revise base year values, and bill plaintiff for underassessments based on the difference between the old and new base year values until April 1993.

ISSUES ONE, TWO AND FIVE: *Propriety of revising base year values and levying escape assessments.*

1. *Could County Levy Supplemental Assessments for the 1988-1989 Assessment Year?*

■ Based on these facts, the answer is no. Section 75.11, which governs supplemental assessments, provided in 1993, in pertinent part: "(d) No supplemental assessment authorized by this section shall be valid, or have any force or effect, unless it is placed on the supplemental roll on or before the applicable date specified in paragraph (1), (2) or (3), as follows: [¶] (1) The fourth July 1 following the July 1 of the assessment year in which the event giving rise to the supplemental assessment occurred. . . . [¶] For the purposes of this subdivision, 'assessment year' means the period beginning annually as of 12:01 a.m. on the first day of March and ending immediately prior to the succeeding first day of March. . . ."

Applying section 75.11, subdivision (d), to the facts of this case, "the event giving rise to the supplemental assessment" was a change in ownership, which "occurred" June 21, 1988. The assessment year in which "the event . . . occurred" was the assessment year "beginning . . . on the first day of March [1988] and ending immediately prior to the succeeding first day of March [1989]." The July 1 of the March 1, 1988, to February 28, 1989, assessment year was July 1, 1988. "The fourth July 1 following" July 1, 1988, was July 1, 1992.

In order to "be valid, or [to] have any force or effect," supplemental assessments would have had to have been levied by July 1, 1992, the fourth July 1 following July 1, 1988. As they were not, County is forever barred from seeking supplemental assessments from plaintiff for the 1988-1989 tax year.

2. *Could County Levy Escape Assessments for Subsequent Years?*

Plaintiff argues that because County delayed too long in seeking supplemental assessments, it is also barred from changing the properties' base year values and from seeking escape assessments. We disagree.

As noted earlier, when the Legislature set a limitations period on the assessor's right to recover supplemental assessments, it was careful to note

that the change did not affect the limitations period for levying escape assessments. "It is the intent of the Legislature that the amendments made by Section 1 of this act to Section 75.11 of the Revenue and Taxation Code shall not be construed to alter in any way the application of the limitations period for escape assessments, established in Section 532 of the Revenue and Taxation Code, and interpreted in the case of Blackwell Homes v. County of Santa Clara, 226 Cal.App.3d 1009 [277 Cal.Rptr. 251]." (Stats. 1992, ch. 663, § 3.)

Before we turn to section 532 and the case of *Blackwell Homes* v. *County of Santa Clara, supra,* 226 Cal.App.3d 1009, however, we must first examine the statute that enables assessors to correct base year values and to levy escape assessments. Section 51.5, subdivision (a) provides that "any error or omission in the determination of a base year value . . . , including the failure to establish that base year value, which does not involve the exercise of an assessor's judgment as to value, shall be corrected in *any* assessment year in which the error or omission is discovered."[5] (Italics added.) Where the correction "increases the base year value, appropriate escape assessments shall be imposed in accordance with this division." (§ 51.5, subd. (d).)

A. *Base Year Values Can Be Corrected at Any Time.*

Section 51.5, subdivision (a) thus allows assessors who have not exercised their judgment as to value to correct base year values "whenever it is discovered that a base-year value does not reflect applicable constitutional or statutory valuation standards or the base-year value was omitted. Any limitations imposed upon the assessor's authority to correct these errors would result in a system of taxation which, on the one hand, denies the benefits of Article XIII A of the California Constitution to some taxpayers where the barred error or correction would reduce the base-year value and, on the other hand, encourages even the most honest person to engage in deception and concealment in order to delay discovery of changes in ownership or new construction beyond the point where a correction of the base-year value can be made." (Stats. 1987, ch. 537, § 1, subd. (a), p. 1834.)

B. *Escape Assessments Can Be Levied Only Within the Time Limits Specified in Sections 51.5, Subdivision (a) (or (b)) and 532.*

The fact that there is no limitations period for correcting base year values (not involving the assessor's exercise of judgment as to value) does not

---

[5]On the other hand, where the error or an omission "involves the exercise of an assessor's judgment as to value," the assessor may correct it "only if it is placed on the current roll or roll being prepared, or is otherwise corrected, within four years after July 1 of the assessment year for which the base year value was first established." (§ 51.5, subd. (b).)

mean, however, that there is no limitations period for levying escape assessments based on the changed base year value. Section 51.5, subdivision (d), permits assessors to levy only "appropriate escape assessments" when revaluation results in an increase in the base year value.

This is where section 532 comes into play. It explains which escape assessments are "appropriate," i.e., timely, and which are not. The 1993 version of section 532 provided that escape assessments not subject to a penalty "shall be made within four years after July 1 of the assessment year in which the property escaped taxation or was underassessed. 'Assessment year' means the period defined in Section 118." (Stats. 1987, ch. 537, § 5, p. 1837.) Section 118 defines "[a]ssessment year" as "the period beginning with a lien date and ending immediately prior to the succeeding lien date for taxes levied by the same agency." This definition presupposes a new "assessment year" every year. As soon as one ends, another begins.

To determine whether an escape assessment for a particular assessment year is valid and timely, two criteria must be met. First, the property must have escaped taxation or been underassessed in that year because the taxes were calculated based on an earlier and lower base year value. Second, the county must have billed the property owner for escape assessments "within four years after July 1" of this particular assessment year.

By way of illustration, let us assume there was a change in ownership or new construction in June 1980 that was promptly reported, but the assessor did not revise the base year value or levy escape assessments until June 1990. Because the taxpayer was paying property taxes based on a prior and lower base year value, his or her property was escaping taxation or was underassessed in each of the assessment years since 1980. However, the assessor would not be permitted to levy escape assessments in June 1990 for the 1980-1981, 1981-1982, 1982-1983, 1983-1984, 1984-1985, and 1985-1986 assessment years as such assessments would not have been made "within four years after July 1" of any of those years. On the other hand, the assessor could bill the taxpayer for the 1986-1987 assessment year and subsequent years as such assessments would be made "within four years after July 1" of each of those years.

Plaintiff here relies heavily upon a 1986 opinion of the First District, *Dreyer's Grand Ice Cream, Inc.* v. *County of Alameda* (1986) 178 Cal.App.3d 1174 [224 Cal.Rptr. 285]. In that case, the court concluded that section 532, which preceded Proposition 13, was in some ways inconsistent with it. To harmonize the two, the court held that (1) the "lien date" (i.e., March 1)

should be substituted for the "July 1" date referred to section 532, and (2) "the year when the base value of the property was determined pursuant to" Proposition 13 should be substituted for the term "the assessment year" in section 532. (178 Cal.App.3d at p. 1180.)

. In *Blackwell Homes* v. *County of Santa Clara*, *supra*, 226 Cal.App.3d at page 1017, we disagreed with the *Dreyer's* court's interpretation of section 532. We concluded there was no inconsistency between Proposition 13 and section 532. Thus, in our view, "assessment year" meant assessment year, and "July 1" meant July 1. We noted that the Legislature had expressly found " 'that the provisions of law relating to escape assessments are in no way inconsistent with Article XIII A of the California Constitution. An escape assessment merely reflects the amount by which the property has been underassessed and is a mechanism which permits the correction of the effects of that underassessment. The amount of the underassessment must be determined, however, in accordance with the applicable statutory valuation standards. Thus, an escape assessment is merely a mechanism for implementing existing property tax law and cannot be in conflict with it.' (Stats. 1987, ch. 537, § 1, p. 466.)" (*Blackwell Homes* v. *County of Santa Clara*, *supra*, 226 Cal.App.3d at pp. 1015-1016.)

As the court observed in *Sea World, Inc.* v. *County of San Diego* (1994) 27 Cal.App.4th 1390 [33 Cal.Rptr.2d 194], "The legislative analysis for Senate Bill No. 587 reveals it was drafted in response to *Dreyer's Grand Ice Cream, Inc.* v. *County of Alameda*[, *supra*,] 178 Cal.App.3d 1174, which determined the assessor could not correct a post-1975 base year value where the correction was made more than four years after March 1 of the year for which the base year value was established. While *Dreyer's* concerned an error in an assessor's value judgment concerning a base year value, the Legislature wanted to clarify other types of corrections and the differences between escape assessments applying to property which was underassessed and that which had totally escaped assessment. (SBE, Analysis of Sen. Bill No. 587, *supra*.) 'In view of the serious interpretational questions raised by the *Dreyer's* decision, it is necessary for the Legislature to adopt clear guidelines for the correction of post-1975 base year values and to restore the statutory meaning of the terms used in the escape assessment provisions.' (*Ibid.*; see also *Blackwell Homes* v. *County of Santa Clara*[, *supra*,] 226 Cal.App.3d 1009, 1014-1016.)" (*Sea World, Inc.* v. *County of San Diego*, *supra*, 27 Cal.App.4th at p. 1399, fn. 13.)

The Legislature's intent to "restore the statutory meaning of the terms used in the escape assessment provisions" clearly applied to the key term,

"assessment year," and the controlling date, "July 1." By restoring the statutory meaning to these words, the Legislature permitted assessors to seek escape assessments even in situations where the base year value was corrected more than four years after the triggering event. This is because there is a new assessment year each and every year while there is only one year when the base year value of a particular property is established.

In the instant case, had the *Dreyer's* interpretation prevailed, no escape assessments could have been levied. That is because, under *Dreyer's*, the only timely escape assessments are those made within four years of the year when the new base year value was determined. On the other hand, applying this court's interpretation in *Blackwell Homes* and the language of section 532, escape assessments for the last four years are timely.[6]

Our conclusion is consistent with that taken by the SBE in its January 7, 1993, letter to assessors discussing the new time limits for imposing supplemental assessments pursuant to section 75.11.[7] The letter states: *"Time Limits for Escape Assessments are Unaffected* [¶] Chapter 663 contains a

---

[6]Plaintiff purports to rely upon *Blackwell Homes*, quoting the following statement from our opinion: "Since the property in this case was first underassessed in the 1983-1984 assessment year, the assessor had four years from July 1, 1983—i.e., until July 1, 1987—in which to levy escape assessments for the intervening years. Since the escape assessments here were levied before July 1, 1987, they were within the statutory period." (*Blackwell Homes* v. *County of Santa Clara*, *supra*, 226 Cal.App.3d at p. 1016.) Plaintiff surmises that "had escape assessments been levied *after* July 1, 1987, such assessments would have been untimely." This, however, is not the case as we explained more fully in *Blackwell Homes*. Of the four intervening years, only the first would be beyond the statute of limitations set forth in section 532 if the assessor did not levy escape assessments until after July 1, 1987 (assuming the assessments were made by June 30, 1988).

Plaintiff also quotes the following language from our opinion: "Thus, we conclude that for all cases arising before the enactment of [section 51.5], the better rule to follow is to strictly adhere to the statutory language, permitting the levy of any escape assessment 'made within four years after July 1 of the assessment year in which the property escaped taxation or was underassessed.' (§ 532.) The assessor may revise base year values and levy escape assessments for the preceding four years, but no others, no matter when the underassessment is discovered. The only reasonable exception to this rule should be in the situation where the assessor has already had one 'bite [at] the apple,' i.e., where he has once exercised his judgment as to value of the property and now wants to change his mind. In that situation, we agree with *Dreyer's* and current legislation that he should do it within four years or not at all." (*Blackwell Homes* v. *County of Santa Clara*, *supra*, 226 Cal.App.3d at p. 1017.) Plaintiff points out, "Thus, the Court of Appeal in *Blackwell Homes* recognized that some assessments may be permanently barred." Those assessments that may be permanently barred, however, are those where the assessor has already exercised his or her judgment as to value. That is not the situation here.

[7]The SBE is mandated, pursuant to Government Code section 15606, subdivision (e), to "[p]repare and issue instructions to assessors designed to promote uniformity throughout the state and its local taxing jurisdictions in the assessment of property for the purposes of taxation." As the court noted in *Dreyer's Grand Ice Cream, Inc.* v. *County of Alameda, supra,*

Statement of Legislative Intent which makes clear that the newly added time limits for making supplemental assessments do not affect the existing statute of limitations under Section 532 for making escape assessments. [¶] Thus, for example, where new construction was completed April 1, 1989, the (two) supplemental assessments would have to be enrolled by July 1, 1993 since, as in the example above, that would be the fourth July 1 following the assessment year in which the event giving rise to the supplemental assessment occurred. But even if the supplemental assessments were not made by July 1, 1993, the assessor would still be obligated to enroll escape assessments for any years still open under Section 532. Specifically, if the new construction went undiscovered until July 2, 1993 (so that no supplemental assessments and no escape assessments were made by that date), the assessor would still be required to levy an assessment for the current roll year, 1993-94, and escape assessments for the 1990-91, 1991-92, and the 1992-93 assessment[] years, despite the fact that the supplemental assessments would now be barred. (Under Section 532, the 1990-91 escape assessments would have to be made by July 1, 1994.)" (See also 1 Ehrman & Flavin, Taxing Cal. Property (3d ed., 1996 supp.) §§ 12:09 & 14:02.)

■ This analysis is predicated on the proposition that the assessor did not exercise his or her judgment as to value when it failed to do anything at all to revise the base year values on the five properties. Plaintiff takes issue with this proposition. Plaintiff contends the assessor does exercise his or her judgment as to value when he or she enters a figure on the county's assessment rolls. As noted in our discussion of the statutory scheme governing real property taxation, an assessor is required to enter a value for every property within the county on the county assessment rolls each year. (§§ 401, 401.3.)

However, after a property's base year value is determined, subsequent entries onto the assessment rolls are done pro forma without the need to exercise one's judgment as to value, simply by applying an inflation factor to the previous year's entry. Section 51 specifies that "for each lien date after the lien date in which the base year value is determined pursuant to Section 110.1, the taxable value of real property shall, except as otherwise provided in subdivision (b) or (c), be the lesser of: [¶] (1) Its base year value, compounded annually since the base year by an inflation factor" or its full cash value.

---

178 Cal.App.3d at page 1183, ". . . the contemporaneous construction given to a statute by administrative officials charged with its enforcement and interpretation is entitled to considerable weight . . . ." In *Dreyer's*, however, the court found that SBE's "interpretation of Section 532 simply does not withstand legal scrutiny; consequently we are disinclined to follow it." (*Ibid.*) This court disagreed in *Blackwell Homes*.

Here, the assessor's initial failure to establish a base year value could not have been an error involving the assessor's judgment as to value within the meaning of section 51.5, subdivision (b), because the assessor did not determine a new base year value until late 1992 and early 1993, when the escape assessments were levied. The Legislature specifically provided in section 51.5, subdivision (a) that "any error or omission in the determination of a base year value . . . , *including the failure to establish that base year value*, which does not involve the exercise of an assessor's judgment as to value, shall be corrected in any assessment year in which the error or omission is discovered." Under these circumstances, we hold that where the assessor has taken no action to adjust the base year value, he or she has not exercised his or her judgment as to value.

 Accordingly, we hold that the escape assessments levied in this case were timely because they did not involve the assessor's judgment as to value and because they were made within four years of July 1 of the assessment years involved.

ISSUE TWO: *Are the Escape Assessments Barred by Code of Civil Procedure Section 338, Subdivision (a)?*

 Plaintiff contends that if the escape assessments are not barred by section 51.5, 75.11, subdivision (d), or 532, they are nevertheless barred by Code of Civil Procedure section 338, subdivision (a). We disagree.

Code of Civil Procedure section 338, subdivision (a) provides that civil actions "upon a liability created by statute, other than a penalty or forfeiture" must be brought "[w]ithin three years." This statute has no applicability here. County has not brought a civil action against plaintiff.

As has been noted in earlier sections of this opinion, the assessor's authority to levy real property taxes is exhaustively set forth in the Revenue and Taxation Code. Sections 51.5 and 532 specifically deal with the time limits for imposing escape assessments. The assessor does not need to file a civil action in order to perfect the county's lien for taxes levied. By operation of law a tax lien is imposed on the subject property. (§ 2187.)

The opinion plaintiff cites to support its argument that Code of Civil Procedure section 338, subdivision (a), applies is inapposite. In *Silver* v. *Watson* (1972) 26 Cal.App.3d 905 [103 Cal.Rptr. 576], a taxpayer brought an action in 1970 to recover, on behalf of the county, personal property (not real property) taxes that allegedly should have been paid by a business enterprise for the years 1961 and 1962. The complaint alleged that the

county assessor and others conspired to permit the underassessment, that the assessor had been indicted for conspiracy and bribery in connection with the same incident, but that after the trial resulted in an acquittal, the county refused to take any action to collect the unpaid taxes. The trial court sustained general demurrers without leave to amend and the Court of Appeal affirmed. As to the property owner involved, the court held the time for imposition of additional taxes for the years in question had expired before plaintiff's action was commenced. Thus, this was a case involving the appropriate limitations period in which to commence a civil action. It has no application whatsoever under the facts of this case.

ISSUE THREE: *Should the Escape Assessments Be Barred by Equitable Principles?*

■ Plaintiff's final contention is that "equity requires that the escapes are barred after four years. This is because the taxpayer may not change the base year values under Section 80 after four years. [¶] The rationale which the County and the Trial Court follow would permit an assessment to be made at any time, e.g., one hundred years from July 1, 1988. This approach is contrary to Article XIIIA, its implementing legislation and the fact that statutes are to be construed against the taxing authority. [Citations.]"

We discern two equitable arguments. The first is that it is unfair that counties can change base year values indefinitely because a taxpayer can only challenge the value established for four years. Where a county changes the base year value more than four years after the event triggering the revaluation, a taxpayer, plaintiff implies, is permanently precluded from challenging the value established. Plaintiff, however, is mistaken. Section 80 provides, in pertinent part: "(a) An application for reduction in the base year value of an assessment on the current local roll may be filed during the regular filing period for that year as set forth in Section 1603 or Section 1840, subject to the following limitations: . . . [¶] (4) The base-year value determined pursuant to Section 51.5 shall be conclusively presumed to be the base-year value unless an application for equalization is filed during the appropriate equalization period *for the year in which the error is corrected or in any of the three succeeding years*. Once an application is filed, the base-year value determined pursuant to that application shall be conclusively presumed to be the base-year value for that assessment." (Italics added.) Here, the base year values were corrected in late 1992 or early 1993. Consequently, plaintiff has until late 1996 or early 1997 to contest the valuations. It is the year when the error is corrected that triggers the limitations period in section 80.

Plaintiff's second equitable argument is that revaluations made "at any time," even 100 years after the event giving rise to the revaluation, are inherently unfair. We disagree. The Legislature has pointed out that what is inherently unfair is that some real property owners fail to pay their fair share of property taxes as mandated by Proposition 13.[8] In the extreme situation cited by plaintiff where a property is not reassessed until 100 years after the triggering event, the property owner has received a substantial windfall—96 years of paying less than its fair share of property taxes. However, for the last four years, the property owner must pay taxes based on the corrected base year value. In addition, the taxpayer retains the right for a period of four years after the error is corrected to challenge the new base year value.

Under these circumstances, we hold that equitable principles do not bar application of sections 51.5 and 532.

DISPOSITION

The judgment is affirmed.

Bamattre-Manoukian, J., and Mihara, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 20, 1996.

---

[8]For example, the Legislature enacted the supplemental assessment provision, section 75.11, to avoid the four-to-sixteen-month delay in reassessing property after a change in ownership or new construction. The Legislature found the delay was "an unwarranted reduction of taxes for some taxpayers with a proportionate and inequitable shift of the tax burden to other taxpayers." (§ 75.)