[No. E030299. Fourth Dist., Div. Two. Dec. 31, 2002.]

EL DORADO PALM SPRINGS, LTD., Plaintiff and Appellant.
RIVERSIDE COUNTY BOARD OF SUPERVISORS et al., Defendants
and Respondents.

## COUNSEL

Gilchrist & Rutter, Frank Gooch III and Thomas W. Casparian for Plaintiff and Appellant.

Bill Lockyer, Attorney General, David S. Chaney, W. Dean Freeman and Brian D. Wesley, Deputy Attorneys General, for State Board of Equalization as Amicus Curiae on behalf of Plaintiff and Appellant.

William C. Katzenstein, County Counsel, Joe S. Rank, Assistant County Counsel, and Carole A. Nunes-Fong, Deputy County Counsel, for Defendants and Respondents.

OPINION

GAUT, J.—

### 1. *Introduction*

Revenue and Taxation Code section 51,[1] enacted in 1978 as Proposition 8, allows the taxable value of real property to be reduced due to a decline in value.[2]

In 1997, plaintiff El Dorado Palm Springs, Ltd., a partnership (El Dorado), prevailed on an assessment appeal and obtained a reduction in a real property tax assessment for the tax year 1993.[3] El Dorado failed to obtain a similar reduction for the five tax years 1994 through 1998. In 1999, El Dorado then filed suit seeking tax refunds for all five years. On appeal, El Dorado challenges the trial court's judgment in favor of the County of Riverside (County).

We agree section 51, subdivision (e), as it currently exists, requires the tax assessor to reappraise property after there has been a reduction in a tax assessment due to a decline in value. Therefore, the tax assessor must now reappraise the value of the property for 1994 and 1995 and determine the property's assessable value. But El Dorado is not entitled to a refund for 1996, 1997, and 1998 because the reappraisals, as ultimately performed for those years, supported the assessments imposed by the County. We reverse the judgment as to the years 1994 and 1995 but affirm the judgment as to the years 1996, 1997, and 1998.

### 2. *Factual and Procedural Background*

The superior court decided this case based on stipulated facts and evidence. Four types of real property values are pertinent to our discussion: the base year value[4]; the factored base year, or Proposition 13, value;[5] the reduced, or Proposition 8, value; and the fair market value.

In April 1986, plaintiff purchased the El Dorado Mobile Home Park, a 34-acre development located in Palm Springs, for $7.5 million. In 1987, the

---

[1]All further statutory references are to the Revenue and Taxation Code unless otherwise stated.

[2]Section 51, subdivision (a)(2).

[3]Six tax years are involved: 1993/1994, 1994/1995, 1995/1996, 1996/1997, 1997, and 1998. For clarity, we refer to the tax years as 1993, 1994, 1995, 1996, 1997, and 1998.

[4]Section 110.1, subdivision (b).

[5]California Constitution, article XIII A, section 2, subdivisions (a) and (b); Revenue and Taxation Code sections 51, subdivision (a), and 110.1, subdivision (f).

county tax assessor established the new base year value of the property based on the change of ownership. In 1993, the enrolled value of the property was the factored base year value of $8,592,156, meaning the base year value had increased by 2 percent each year since 1987. El Dorado submitted an assessment appeal to reduce the 1993 tax assessment. El Dorado asserted the assessment was too high because the property had been subject to a temporary rent increase that expired on June 1, 1993, reducing the value of the property.

In September 1995, the County Assessment Appeals Board denied El Dorado's assessment appeal and upheld the enrolled value of $8,592,156 for 1993. After El Dorado filed a petition for writ of mandate, the superior court granted the petition and issued a peremptory writ commanding the appeals board to vacate its findings and to conduct further proceedings in accordance with the court's directions. In February 1997, after a second assessment hearing, the appeals board found the Proposition 8 value for the property was only $6,190,455 for 1993.

During and after the time the assessment appeal was pending, the tax assessor had continued to assess the property in increasingly higher amounts for the tax years 1994 through 1998 based on the factored 1987 base year value. In other words, the tax assessor increased the assessment on the property the maximum of 2 percent every year. By 1998, the enrolled value had increased to $9,328,976.

In September 1997, after obtaining the Proposition 8 reduction, El Dorado tried to submit assessment appeals for the tax years 1994 and 1995, but the County rejected the appeals as untimely. For the tax years 1996, 1997, and 1998, El Dorado submitted timely assessment appeals. Based on the County's appraisals, performed in 1998 and 2000, the appeals board found the market value of the property for 1996, 1997, and 1998 exceeded the enrolled value. The appeals board adopted the enrolled values as the Proposition 8 values for the property and refused to reduce the tax assessments for the latter three years.

El Dorado then filed its 1999 lawsuits for refunds. The trial court found El Dorado had failed to exhaust its administrative remedies and was too late in seeking an adjustment for the tax years 1994 and 1995. The court also found, in agreement with the findings of the appeals board, that El Dorado was not entitled to a reduction for the tax years 1996, 1997, and 1998 because the fair market appraisals supported the enrolled values for those years.

### 3. *Section 51*

After a Proposition 8 reduction has been granted due to a decline in the value of property, section 51, subdivision (e), provides that the assessor shall

continue to reappraise the reduced-value property in subsequent years until its fair market value exceeds the Proposition 13 value. The full text of subdivision (e) provides: "Nothing in this section shall be construed to require the assessor to make an annual reappraisal of all assessable property. However, *for each lien date after the first lien date for which the taxable value of property is reduced* pursuant to paragraph (2) of subdivision (a), *the value of that property shall be annually reappraised* at its full cash value as defined in Section 110 until that value exceeds the value determined pursuant to paragraph (1) of subdivision (a). In no event shall the assessor condition the implementation of the preceding sentence in any year upon the filing of an assessment appeal." (Italics added.)[6]

The first disagreement between the parties involves whether and when reappraisal is required by section 51, subdivision (e). El Dorado interprets the statute to require the assessor to reappraise the subject property for 1994, 1995, and 1996, while El Dorado's unresolved challenge to the 1993 assessment was pending, even though the 1993 Proposition 8 reduction was not established until February 1997. The assessor did not appraise the property until 1998 and 2000 in connection with the assessment appeals involving 1996, 1997, and 1998. Therefore, El Dorado contends that any assessment for 1994 through 1998 exceeding the 1993 Proposition 8 value of $6,190,455 is void and El Dorado should receive refunds of those excess amounts.

The County argues that if any reappraisal was required it was not until after February 1997 and that reappraisals were made for 1996, 1997, and 1998. The State Board of Equalization (SBE), in its amicus curiae brief, maintains that reappraisal became mandatory after February 1997. The SBE asserts the reappraisals for 1996, 1997, and 1998 satisfy section 51, subdivision (e), but the tax assessor should now reappraise the property for 1994 and 1995.

■ We agree with the SBE that section 51, subdivision (e) requires the tax assessor to reappraise property after an assessment has been reduced due to a decline in value. But based on the plain language of the statute, we reject El Dorado's interpretation that reappraisals had to be performed before February 1997. The statute provides that "for each lien date after the first lien date for which the taxable value of property is reduced . . . the value of that property shall be annually reappraised."[7] Under the circumstances of this case, the taxable value of property was not reduced until February 1997.

---

[6]Section 51, subdivision (e).
[7]Section 51, subdivision (e).

Furthermore, as we discuss below, just as El Dorado is spared having to file protective appeals, it is unreasonable to require the County to anticipate what happened in this case and to perform prophylactic appraisals in advance of the final Proposition 8 determination. The County could not have known it had to reappraise the property until the date the Proposition 8 value was finally established. Reappraisal was not required until there was a Proposition 8 reduction although the reappraisal requirement then became retroactive to 1994 and 1995.

Finally, we decide that, although not until February 1997 were annual reappraisals required for 1994, 1995, or 1996, the appraisals performed in 1998 and 2000 fulfilled the requirement of section 51, subdivision (e), for 1996, 1997, and 1998.

In reaching our conclusions, we analyze differently the two sets of tax years involved beginning with 1994 and 1995 and continuing with 1996, 1997, and 1998.

### 4. *The Tax Years 1994 and 1995*

 The second disagreement between the parties concerns whether El Dorado had to exhaust its administrative remedies by filing assessment appeals for 1994 and 1995. The County argues that because El Dorado did not file assessment appeals it failed to exhaust its administrative remedies and its civil actions for refunds are barred. Both El Dorado and the SBE contend section 51, subdivision (e) expressly relieves a taxpayer from having to file an assessment appeal. On this point, we agree with El Dorado and the SBE's position.

Usually, to obtain a reduced assessment, the taxpayer must file an assessment appeal in accordance with sections 80 and 1603. When El Dorado applied in September 1997 for a changed assessment for the tax years 1994 and 1995, it was too late by two or three years.[8] But after a property owner has been granted a Proposition 8 reduction, section 51 dispenses with the usual requirement to file an assessment appeal. Subdivision (e), as amended in 1996, explains the tax assessor cannot make filing an assessment appeal a condition of making a reappraisal: "In no event shall the assessor condition the implementation of the preceding sentence [i.e. annual reappraisal] in any

---

[8]Section 1603, subdivision (b)(1); *Metropolitan Culinary Services, Inc. v. County of Los Angeles* (1998) 61 Cal.App.4th 935, 941, footnote 7 [71 Cal.Rptr.2d 859].

year upon the filing of an assessment appeal."⁹ By unambiguous statutory mandate,¹⁰ no assessment appeal was necessary for 1994 and 1995.

Support for this position is found in the legislative history for the 1996 amendment. The legislative analysis states: "THIS BILL would require assessors to annually reappraise property whose value (pursuant to Proposition 8) has been reduced below the Proposition 13 adjusted base year value. Annual reappraisal would continue, at current market value, until the value again reached the Prop. 13 adjusted base year value. . . . [¶] . . . [¶] The bill is intended to ensure that those whose property values decline below the base year value due to economic or other conditions are not immediately brought back up to the base year value in the next year. The author is responding to complaints in some counties that the assessor immediately restores the property up to the adjusted base year value the year after a reduction, unless the taxpayer appeals the assessment each year."¹¹

Section 51 prohibits the tax assessor from ignoring a Proposition 8 reduction in subsequent years. On the other hand, the County cannot be penalized for not reappraising property in 1994 and 1995 when its duty to do so was not triggered until 1997. Therefore, the trial court erred when it found El Dorado had failed to exhaust its administrative remedy. Instead the proper resolution was for the trial court to declare the tax assessor was required to reappraise the property for 1994 and 1995 in compliance with section 51, subdivision (e). We suggest, without deciding, the trial court may eventually need to remand the matter to the assessment appeals board while retaining jurisdiction over the present refund action.¹²

### 5. *The Tax Years 1996, 1997, and 1998*

The parties also disagree about whether the appraisals made in 1998 and 2000 can support the assessments for 1996, 1997, and 1998.

El Dorado filed timely assessment appeals for 1996, 1997, and 1998. At the assessment appeals hearings for those years, the assessor submitted appraisals demonstrating that the enrolled value of the property was less than the fair market value of the property, thus justifying the amount of the tax assessment. The enrolled value for 1996 was $8,966,724; the market value was $9,326,084. The enrolled value for 1997 was $9,146,057; the market value was $9,375,000. The enrolled value for 1998 was $9,328,976; the market value was $9,467,000.

---

⁹Section 51, subdivision (e).

¹⁰*Jenkins v. County of Los Angeles* (1999) 74 Cal.App.4th 524, 530 [88 Cal.Rptr.2d 149].

¹¹Senate Bill No. 821 (1995-1996 Reg. Sess.).

¹²*Plaza Hollister Ltd. Partnership v. County of San Benito* (1999) 72 Cal.App.4th 1, 22-25 [84 Cal.Rptr.2d 715].

El Dorado does not argue that the assessor incorrectly reappraised the property for the years 1996 through 1998. Its sole contention is that the assessor should have reappraised the property every year after 1993 and the failure to do so means the 1996, 1997, and 1998 tax assessments are void for failure to follow statutory procedure.

As to the year 1996, there was no failure to follow statutory procedure. Furthermore, we reject El Dorado's argument and hold that the appraisals completed in 1998 and 2000 justified the 1996, 1997, and 1998 assessments. In particular, we do not accept El Dorado's contention that, because assessments cannot be retroactive, the subject appraisals could not be used in the assessment appeals. Although a retroactive *assessment* may be prohibited, there is no authority stating that a later *appraisal* cannot be used to support an assessment that was timely when imposed. Furthermore, when the reappraisals were finally performed, the tax assessor succeeded in fulfilling the reappraisal requirement of section 51, subdivision (e).

### 6. *Section 4831*

As a final note, we comment briefly on the applicability of the one-year statute of limitations set forth in section 4831, subdivision (b), for errors involving reduction in value: "Any error or omission involving the exercise of a value judgment that arises solely from a failure to reflect a decline in the taxable value of real property as required by paragraph (2) of subdivision (a) of Section 51 shall be corrected within one year after the making of the assessment that is being corrected." In turn, section 51, subdivision (a)(2) provides: "(a) . . . [F]or each lien date after the lien date in which the base year value is determined pursuant to Section 110.1, the taxable value of real property shall, except as otherwise provided . . . be . . . . [¶] . . . [¶] (2) Its full cash value, as defined in Section 110, as of the lien date, taking into account reductions in value due to damage, destruction, depreciation, obsolescence, removal of property, or other factors causing a decline in value." ■ The County contends the one-year limitations period prevents it from correcting the assessments for 1994 and 1995 if they are wrong because there was a reduction in value.

We reject this assertion because it would render meaningless portions of section 51, especially subdivisions (a) and (e).[13] The tax assessor could simply wait a year without recognizing a reduced value and let the clock run out on the limitations period. But we must interpret statutes to be consistent and the interpretation proposed by the County would nullify section 51. Instead, we hold that the delay in establishing the Proposition 8 reduction

---

[13]*People v. Hicks* (1993) 6 Cal.4th 784, 796 [25 Cal.Rptr.2d 469, 863 P.2d 714].

necessarily extends the time period for correcting an error in the tax assessments until after the property has been reappraised and the taxable value established.

### 7. *Disposition*

There are significant problems with implementing section 51, subdivision (e), as it is currently written. We hope the Legislature will consider the issues raised.

In the meantime, we affirm in part, reverse in part, and remand for further proceedings. We deem it premature to address the issue of attorney's fees as the trial court has not yet determined who is the prevailing party.

In the interests of justice, we order each party to bear its own costs on appeal.

Ward J., concurred.

**McKINSTER, J., Acting P. J.,** Concurring and Dissenting.—I concur in the majority's resolution of the issues concerning the assessments for the 1994 through 1997 tax years. However, I disagree with the majority's analysis regarding the assessment for the 1998 tax year.

Each year, the assessor must assess all taxable property in the county on the lien date to the person who owns that property on that date. (Rev. & Tax. Code, §§ 401.3 & 405, subd. (a).)[1] The lien date is the date on which the taxes for a fiscal year attach to and become a lien against the property (§ 117), i.e., "the first day of January preceding the fiscal year for which the taxes are levied" (§ 2192). For example, for the fiscal year of July 1, 1997, through June 30, 1998 (to which the majority opinion refers as tax year 1997 (maj. opn., *ante*, at p. 1265, fn. 3)), the lien date is January 1, 1997.

In general, real property is assessed on the basis of the lesser of two possible taxable values. (§ 51, subd. (a).) One alternative is the base year value (i.e., the value of the property at time of acquisition), as adjusted for inflation since the base year, not to exceed two percent each year, to produce the "factored" base year value. (*Id.*, subd. (a)(1).) The other alternative is its full cash, or market, value. (*Id.*, subd. (a)(2).)

In a rising real estate market, the factored base year value will generally be the lower of the two alternatives. But the full cash value of a parcel may

---

[1]All further section references are to this code.

drop below the factored base year value "due to damage, destruction, depreciation, obsolescence, removal of property or other factors" (§ 51, subd. (a)(2)), such as a general decline in market demand. In that event, the assessor must base the assessment on that lower value.

But if the assessor reduces the assessment in a given year to reflect a full cash value lower than the factored base year value, what happens the next year? Under what circumstances may the assessor thereafter resume its reliance on the higher factored base year value?

The Legislature has answered that question in section 51, subdivision (e): "Nothing in this section shall be construed to require the assessor to make an annual reappraisal of all assessable property. However, for each lien date after the first lien date for which the taxable value of property is reduced pursuant to paragraph (2) of subdivision (a), the value of that property shall be annually reappraised at its full cash value as defined in Section 110 until that value exceeds the value determined pursuant to paragraph (1) of subdivision (a). In no event shall the assessor condition the implementation of the preceding sentence in any year upon the filing of an assessment appeal."

In this case, El Dorado Palm Springs, Ltd., appealed its 1993 assessment, which had been based on the factored base year value. El Dorado argued that the market value of this parcel had dropped below the base year value, and therefore the assessment was too high. The assessment appeals board (AAB) agreed in February of 1997, and reduced the 1993 assessment of the property accordingly.

That decision triggered the statutory provision quoted above, that "for each lien date after the first lien date for which the taxable value of property is reduced pursuant to paragraph (2) of subdivision (a) [i.e., when the full cash value drops below the factored base year value], the value of that property shall be annually reappraised at its full cash value as defined in Section 110 until that value exceeds the value determined pursuant to paragraph (1) of subdivision (a) [i.e., until the full cash value exceeds the factored base year value]." (§ 51, subd. (e).) In short, the statute requires the assessor to reappraise the property before resorting to the factored base year value as the basis for the next year's assessment.

In this case, however, the assessor ignored that duty. Although the AAB had decided in February of 1997 that the full cash value of the property had dropped below the factored base year value in 1993, and although no subsequent reappraisals had been done to demonstrate that the full cash value had since risen above the factored base year value, the assessor

nevertheless based the 1998 assessment on the factored base year value. Indeed, the assessor did not reappraise the property until *after* El Dorado had appealed the 1996, 1997, and 1998 assessments. Specifically, the assessors reappraised the property in November of 1998 to defend against the 1996 assessment appeal and in February of 2000 to defend against the 1997 and 1998 assessment appeals.

As the majority seems to concede,[2] the assessor violated section 51, subdivision (e), by failing to reappraise the property prior to relying on the factored base year value for the 1998 assessment. Nevertheless, the majority opinion holds that the assessor's statutory violation was cured by the post-appeal appraisals performed in 1998 and 2000: "[W]hen the reappraisals were finally performed, the tax assessor succeeded in fulfilling the reappraisal requirement of section 51, subdivision (e)." (Maj. opn., *ante*, at p. 1270.)

I agree that the assessor failed to comply with his duties under section 51, subdivision (e). Once the AAB decided in February of 1997 that the full cash value of the property in 1993 was less than the factored base year value, subdivision (e) of section 51 obligated the assessor to reappraise the property *before* resorting to the factored base year value as the basis for the 1998 assessment.

But I do not agree with the majority's conclusion that we should sanction that violation of the law by allowing the assessor to reappraise the property after the 1998 assessment. The Legislature expressly provided that an assessor may not under any circumstances condition its compliance with its obligation to reappraise property before resorting to the factored base year value on the filing of an assessment appeal by a taxpayer. (§ 51, subd. (e) ["In no event shall the assessor condition the implementation of the preceding sentence in any year upon the filing of an assessment appeal."].) By allowing the assessor to ignore the statutory requirement to reappraise before raising the assessment and to "cure" that omission with an appraisal performed only after the taxpayer files an appeal, the rule adopted by the majority eviscerates that statutory prohibition.

There may be circumstances under which an assessor's failure to comply with the clear mandate of section 51, subdivision (e) might be excusable, but the assessor here offered no excuse for his failure to do so. In the absence of

---

[2]In responding to the taxpayer's claim that the 1996, 1997 and 1998 assessments are void as a result of the assessor's failure to follow the statutory procedure, the majority opinion states: "*As to the year 1996*, there was no failure to follow statutory procedure." (Maj. opn., *ante*, at p. 1270, italics added.) By limiting that statement to 1996, it implicitly acknowledges that, as to the other two years, the assessor *did* fail to follow the statutory procedure.

any showing of good cause that might excuse the failure to comply with the law, I cannot join in the majority's endorsement of postassessment appraisals conducted only after the taxpayer appeals.

In my view, the 1998 assessment is invalid because it was made without the statutorily required pre-assessment reappraisal. I would reverse that portion of the judgment that holds to the contrary.

Appellant's petition for review by the Supreme Court was denied March 19, 2003. Baxter, J., was of the opinion that the petition should be granted.